# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **FERNANDO CHAPA and VALERIE CHAPA, Individually and as Guardians of DAKOTA FULLER, a minor,**<br><br>Plaintiffs,<br><br>vs.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | CASE NO. 8:04CV376<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW<br>(AMENDED \*) |

This case was tried to the Court without a jury from May 31 through June 2, 2006. Many facts are undisputed. The case involves the diagnosis and treatment of Dakota J. Fuller during his first months of life, at the Ehrling Bergquist Hospital ("Bergquist") located at Offutt Air Force Base in Bellevue, Sarpy County, Nebraska. The following Findings of Fact and Conclusions of Law require that judgment be entered in favor of the Defendant, the United States of America.

## *FINDINGS OF FACT*

1. Dakota Fuller ("Dakota") was born on August 3, 2001, to his biological parents John and Christina Fuller (collectively the "Fullers"). Dakota was healthy at the time of his birth.

2. On December 2, 2001, John Fuller presented Dakota to Bergquist's emergency department, claiming that Dakota had aspirated food or vomitus. When they arrived, Dakota was not breathing and did not have a pulse. The Bergquist emergency department personnel resuscitated Dakota, stabilized him, and transferred him to Children's Hospital of Omaha for specialized and intensive care.

\* As to paragraph 52 only.

3. Dakota was admitted to Children's Hospital with an initial diagnosis of aspiration pneumonia and respiratory distress. A chest x-ray, ordered to evaluate that diagnosis, revealed several fractures of the ribs, and for that reason, a trauma work-up was ordered.

4. The Children's Hospital physicians diagnosed Dakota with numerous injuries consistent with having been shaken violently, a condition known as "shaken-baby syndrome." Michael Moran, M.D., who was at the time of Dakota's admission the Director of the Child Advocacy Team for Children's Hospital and a board certified pediatrician, consulted on Dakota's case.

5. Dr. Moran testified that repeated CT scans and an MRI scan showed that Dakota's brain was severely swollen and that he had subdural bleeding. Dr. Moran explained that these conditions are consistent with the diagnosis of shaken-baby syndrome. In addition, Dr. Moran testified that there was evidence of chronic bleeding from the brain, indicating that Dakota had suffered brain trauma that had been inflicted before the day that Dakota presented to Children's Hospital.

6. Dr. Moran testified that repeated EEG tests, which measure electrical activity in the brain, were performed at Children's Hospital and revealed abnormalities consistent with seizure-type activity and significantly decreased brain activity. The vision examination revealed bleeding in both of Dakota's eyes, including through the retinal layers. Upon discharge, Dakota was diagnosed with non-accidental trauma; and with subdural hemorrhage with atrophy and cephalomalacia, seizure disorder, retinal hemorrhages and anemia, all secondary to the non-accidental trauma.

7. Dr. Moran testified that Dakota underwent a skeletal survey at Children's Hospital that revealed fractures that were newly-inflicted and others at various stages of healing. The skeletal survey showed a healing clavicle fracture that was more than ten days old based on the level of calcification; a new corner fracture of the left humerus (upper arm); a healing fracture to the left humerus; healing fractures to the right-side, front ribs 3 through 8; healing fractures to the left-side, front ribs 2 through 6; and a corner fracture of the femur at the knee.

8. As described by Plaintiff Valerie Chapa and Dakota's current pediatrician, Gopal Panvelkar, M.D., Dakota suffers from permanent brain damage, blindness, and seizures. Dakota cannot now, and is never expected to be able to, walk or talk. He is incontinent of both bowel and bladder. He cannot feed, dress, or bathe himself, and he cannot perform any normal activities of a non-handicapped child his age. Since Dakota has been under Dr. Panvelkar's care, the shunt that relieves the pressure in Dakota's brain has malfunctioned; he has become dehydrated; he has had trouble breathing; and he has experienced some seizure activity. He also has had surgery to relieve tightness in the tendons in his legs.

9. The Sarpy County Attorney charged John Fuller with first-degree assault and intentional child abuse. John Fuller pled no contest to a reduced charge of attempted felony child abuse on October 22, 2002, and was sentenced on December 6, 2002, to eighteen months' probation.

10. When Dakota was discharged from Children's Hospital, Child Protective Services placed him in the foster care of his paternal grandmother, Valerie Chapa, which

care extended for more than a year.  On June 23, 2003, Valerie Chapa and her spouse, Plaintiff Fernando Chapa, were appointed as Dakota's legal guardians.

11. On August 11, 2004, the Chapas filed a Complaint against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, claiming that the United States is liable for negligence, carelessness, and medical malpractice of its employees, Lyle J. VanderSchaaf, M.D., Richard F. Garri, M.D., and Nurse Practitioner Lynn P. Murphy, in failing to diagnose and treat child abuse as it was allegedly presented in Dakota.

12. In May 2005, Valerie and Fernando Chapa legally adopted Dakota.

13. Between the time of Dakota's birth on August 3, 2001, and his arrival at the Bergquist emergency department on December 2, 2001, Dakota was seen by medical personnel at Bergquist on five occasions.  Three of those visits provide the basis for the Plaintiffs' claims.

14. Bergquist is a "closed" facility – that is it serves active and retired members of the Armed Forces and their dependents, exclusively.  Bergquist includes several clinics where scheduled medical appointments are conducted, a twenty-bed hospital, and an emergency department that is located approximately 100 yards from the clinics.

15. Bergquist has a specific child abuse reporting procedure.  As described by Bergquist's former emergency department physicians, Dr. VanderSchaaf and Dr. Garri, when a Bergquist physician suspects child abuse, an initial call is placed to the Family Advocacy Office ("Family Advocacy").  Dr. VanderSchaaf stated that, based on the severity of the case, Family Advocacy personnel either come to the emergency department immediately or arrange for an open-ended consultation to

occur within approximately one week of the physician's call. No Family Advocacy representative testified in this trial. The physicians may also notify the Offutt Air Force Base police, and, depending on the severity of the injuries, Bergquist's commander and other administrative personnel may be notified. The Base police determine whether civil law enforcement officials need to be notified based on jurisdictional considerations.

16. Since 1984, Katie M. Bradley has served as Bergquist's Medical Record Administrator. Ms. Bradley testified that Bergquist medical records are maintained in a central file area in the hospital. Each patient has a "unit" record, which is composed of all outpatient medical records generated by Bergquist clinic appointments or by the emergency department. A patient's unit record may also include records from actual hospital admissions and from providers not associated with Bergquist.

17. Ms. Bradley testified that if documentation from a clinic visit is prepared and ready to be put in a patient's record, it will be placed in the record by the following day. Ms. Bradley also testified that she is confident that any Bergquist physician who requested a medical record that had been prepared a week before the request would be able to obtain a copy of that record. None of the medical providers took issue with Ms. Bradley's representations regarding the availability of Bergquist records.

18. The first of the three incidents on which the Plaintiffs base their claim occurred on September 25, 2001, when the Fullers brought Dakota to the Bergquist emergency

department, reporting that Christina accidentally gave Dakota an overdose of Sudafed.

19. The overdose was a ten-fold overdose; that is, Christina administered 8 ml. of Sudafed instead of the recommended dosage of 0.8 ml. Accidental ten-fold overdoses are common, even in hospital settings.

20. Lyle J. VanderSchaaf, M.D., was the emergency room physician who diagnosed and treated Dakota for the overdose. Dr. VanderSchaaf took the history from the mother, called the poison control center, kept Dakota for observation for approximately two hours, and then released him to his parents.

21. The second of the three incidents on which the Plaintiffs base their claim occurred on October 5, 2001, when the Fullers brought Dakota to Bergquist for a routine, two-month well-baby check-up. A notation on the medical record prepared during that visit indicates that Dakota's medical records were not available. When John and Christine Fuller were asked, they stated that Dakota had no medical history.

22. Lynn Murphy, a registered nurse practitioner, conducted Dakota's physical examination. During the examination, Murphy noticed a bruise approximately one-centimeter in diameter on Dakota's forehead. She asked the Fullers to explain the origin of the bruise.

23. The Fullers stated that the bruise occurred while Dakota was at daycare. They mentioned that the daycare provider sometimes left Dakota on a couch surrounded by pillows, and that a three-year-old toddler was also present in the daycare provider's home when Dakota was there.

24. In the medical record of that well-baby check-up, Nurse Practitioner Murphy described the bruise as "superficial" and suggested to the Fullers that they change daycare providers or set stricter guidelines with their provider.

25. The third of the three incidents on which the Plaintiffs base their claim occurred one week after the well-baby check-up, on October 12, 2001, when John Fuller again brought Dakota to the Bergquist emergency department. John Fuller reported that he had jerked Dakota by the arm while lifting him. In triage, Dakota's subluxated elbow was set back in place with a simple maneuver. The nursing notes reflect John Fuller's report that Dakota had no medical history.

26. Dakota was examined by Richard F. Garri, M.D., who diagnosed subluxation of the elbow (also referred to as "nursemaid's elbow"). Fuller told Dr. Garri that Dakota had no medical history, which Dr. Garri testified is noted in his record under prior history as "newborn." Dr. Garri did not request Dakota's medical records, but he ordered an X-ray of Dakota's entire left arm, including the shoulder, elbow, and wrist joints. The X-ray was normal, and Dr. Garri released Dakota to his parents.

27. Dr. Garri admitted that if he had known of and had reviewed the information contained in the record from Dakota's prior visits to Bergquist, that information, together with the subluxated elbow injury admittedly caused by jerking, and the parental denial of any past medical history, would more likely than not have "raised a red flag" in his mind. The red flag, more likely than not, would have prompted him to contact either the pediatrician on call at the hospital or to follow up with Dakota's primary care physician to suggest the need for parenting classes, which may have been provided by Family Advocacy.

28. Dakota was seen on two other occasions at the Bergquist clinic. On November 6, 2001, he was seen by Nurse Practitioner Murphy, and on November 16, 2001, Dakota was seen by Janet Goodwin, M.D., a pediatrician. On both occasions, Dakota was examined and diagnosed with respiratory infections. These two visits are not the subject of any malpractice claim by the Plaintiffs.

29. The Chapas filed an administrative claim in the amount of $15 million against the United States Air Force pursuant to the Federal Tort Claims Act on August 28, 2003, and more than six months elapsed without the United States Air Force taking final action on their claim.

30. On August 11, 2004, the Chapas filed a Complaint against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, claiming that the United States is liable for the negligence, carelessness, and medical malpractice of its employees in failing to diagnose and treat child abuse as it was presented in Dakota.

31. Plaintiffs called expert witness John A. Tilelli, M.D.. Dr. Tilelli is board certified in pediatrics, emergency medicine, pediatric critical care, pediatric emergency medicine and toxicology. Dr. Tilelli has been certified as a child abuse expert in several counties in Florida where he now resides and practices.

32. Defendant called expert witnesses Donald Uzendoski, M.D., and Cory Ohlsen, M.D. Dr. Uzendoski is a board certified pediatrician, and Dr. Ohlsen is board certified in emergency medicine.

33. Drs. Tilelli, Uzendoski, and Ohlsen all agree that physicians have a duty to diagnose and treat suspected child abuse.

34. All the expert medical witnesses and the treating physician witnesses agree that the treatment of suspected child abuse includes a referral of a case of suspected child abuse to the appropriate social services entity, such as a child protective service or, in the case of the United States Air Force, Family Advocacy. Assistance through Family Advocacy is available to the military personnel assigned to Offutt Air Force Base.

35. In some circumstances, treatment of suspected child abuse may include admission of the child to a hospital to prevent the child from being discharged into a potentially unsafe environment pending further investigation.

36. Dr. Tilelli also testified that all medical practitioners, presumably including at a minimum physicians and nurse practitioners, have a duty to review all medical data available to them.

37. Dr. Uzendoski stated that the standard of care requires that a history be obtained, either through a medical chart or from a pediatric patient's parents, and that the practitioner must make a determination regarding the reliability of the history if it is provided by the parents.

38. In Dr. Uzendoski's expert opinion, it is consistent with the medical standard of care to have the patient's readily accessible medical records available for review at a clinic visit. Dr. Uzendoski made a distinction, however, in the context of an emergency department visit where he noted that there is generally no attempt to obtain a patient's entire medical record because doing so would not be cost efficient. Dr. Uzendoski testified that when there is information available from a previous visit that would help to inform the emergency department physician

regarding the patient's current condition, then it would be prudent to attempt to obtain the patient's medical record.

39. In Dr. Uzendoski's opinion, Dr. Garri's failure to obtain Dakota's medical record in connection with the October 12, 2001, visit did not breach the standard of care because Dakota presented with an acute injury; the parents reported no previous medical history; and there were no other findings on physical examination or x-ray to indicate cause for concern.

40. Dr. Tilelli testified that Dr. VanderSchaaf's treatment of Dakota fell below the standard of care in that he should have referred the case to social services to investigate how and why the overdose was given, and, if necessary, to provide guidance and education to the parents regarding the administration of over-the-counter prescriptions.

41. Dr. Tilelli testified that Nurse Practitioner Murphy's failure to refer Dakota to social services based on the bruise she observed on Dakota's forehead during the well-baby check breached her duty of care to Dakota. In Dr. Tilelli's opinion, when a medical practitioner observes an injury on a child who is developmentally incapable of inflicting the injury upon himself, the suspicion of child abuse rises to the level that a reasonable practitioner would report the injury to social services. Dr. Tilelli opined that the explanation provided by the Fullers left open the possibility that the injury was inflicted upon Dakota, and Dr. Tilelli said that all inflicted injuries should be investigated by social services.

42. With regard to Dakota's third visit to Bergquist, Dr. Tilelli testified that in his opinion, Dr. Garri's care for Dakota fell below the standard of care. As with the bruise on the

second visit, Dr. Tilelli opined that because the subluxated elbow was an injury that Dakota could not have inflicted upon himself, the case should have been referred to a social service provider for additional investigation. Dr. Tilelli stated that the explanation given by John Fuller, that he accidentally jerked Dakota's arm, was not adequate and required further investigation. Dr. Tilelli also said that picking up an infant by his arm is inappropriate care, whether harm is intended or not.

43. When asked whether Dr. Garri breached the standard of care in failing to review Dakota's prior medical records, Dr. Tilelli stated that Dr. Garri breached the standard of care by failing to review the medical records. Dr. Tilelli stated that the information from a cumulative review would have caused any reasonable physician in like or similar circumstances to refer the case to a social service provider. Specifically, Dr. Tilelli stated that a medical record review would have shown that, in addition to the inflicted injury for which Dakota presented on that day, he had suffered a second inflicted injury as well as the overdose of a medication that may or may not have been administered on the advice of a physician.

44. Dr. Tilelli stated that physicians have the obligation to provide counseling and education to parents on child care and safety, but that investigations relating to inflicted trauma and non-accidental injuries to a child need to be investigated by those entities empowered to do so.

### *CONCLUSIONS OF LAW*

45. This action is properly brought under the Federal Tort Claims Act ("FTCA"). Plaintiffs satisfied all necessary administrative requirements of the Federal Tort Claims Act prior to filing suit in this action. Pursuant to 28 U.S.C. § 2675(a), the

claim was rejected when the agency failed to make a final disposition of the claim within six months after it was filed.

46. Under the Federal Tort Claims Act, the United States has waived sovereign immunity for the negligent acts of its employees who cause personal injury while acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

47. The Court has jurisdiction over the subject matter of the case and the parties.

48. The controlling law for claims arising under the FTCA is the law of the state where the tort occurred. *Budden v. United States*, 15 F.3d 1444 (8th Cir. 1994) (citing *Goodman v. United States*, 2 F.3d 291 (8th Cir. 1993)), and, here, the events giving rise to the Chapas' claim occurred in Nebraska.

49. To present a medical malpractice claim in Nebraska, a plaintiff must establish by a preponderance of the evidence: 1) the generally recognized medical standard of care; 2) a deviation from that standard, and 3) that the deviation was a proximate cause of the plaintiff's alleged injuries. *Hamilton v. Bares*, 678 N.W.2d 74, 79 (Neb. 2004) (citing *Neill v. Hemphill*, 607 N.W.2d 500 (Neb. 2000)).

50. The Court has considered the expert testimony on the standard of care with regard to diagnosis and treatment, and I conclude that the generally recognized medical standard of care requires physicians and nurse practitioners to diagnose and treat suspected child abuse. In this case, the expert witnesses and treating physicians alike agreed that this standard of care exists, and that it is *reasonable suspicion*, and not *certainty*, that defines the duty.

51. The Court has considered the expert testimony on the standard of care applicable to the review of medical records, and I conclude that the generally recognized medical standard of care requires that physicians and nurse practitioners review readily accessible medical records when a pediatric patient presents with inflicted trauma.

52. The reasonable physician's standard of care includes the duty to review readily accessible medical records for pediatric patients who present with inflicted trauma,[1] because such a review is necessary to determine whether a child has experienced repeated injuries indicative of abuse or neglect. The review of such records is also necessary to enable the medical professional to evaluate the plausibility of any history provided by the person who presents the child for treatment, because abusers, and even victims of abuse who can communicate, commonly conceal the true cause of injuries.

53. I conclude that Dr. Lyle J. VanderSchaaf acted within the standard of care with regard to his treatment of Dakota on September 25, 2001, and that there was no basis upon which a reasonable physician would conclude, given the patient's history and the parent's explanation, that the ten-fold overdose of over-the-counter medication was anything other than accidental.[2]

---

[1] "Inflicted trauma" was defined during the trial as any injury that the patient could not have caused to himself.

[2] Plaintiffs' theory of recovery relative to Dr. VanderSchaaf's treatment does not rest on any alleged breach of the duty to review Dakota's medical records, presumably because Dakota had no prior medical records at the time of Dr. VanderSchaaf's treatment, other than those relating to birth.

54. I conclude that Nurse Practitioner Lynn P. Murphy acted within the standard of care in the treatment of Dakota Fuller on October 5, 2001. During her physical examination of Dakota, she observed a single, superficial bruise that was approximately one centimeter in diameter on Dakota's forehead, and she queried the parents about the injury. She obtained information about when, where, and how the injury occurred. She was told, by Dakota's parents, that it happened at Dakota's daycare; that the provider sometimes left Dakota on a couch surrounded by pillows; and that a toddler was also present at the home when Dakota was there. As reflected in the record of the visit, Nurse Practitioner Murphy provided counseling regarding removal of Dakota from the daycare facility where the injury was believed to have occurred, or, in the alternative, enforcement of stricter guidelines for the care-giver.

55. Nurse Practitioner Murphy noted on the record for that visit that Dakota's medical record was not available, that the parents stated that he had no medical history, and she conceded that she did not search out emergency department records. Because the evidence is ambiguous regarding whether Nurse Practitioner Murphy actually requested the records and they were unavailable to her, or whether she did not request the records and for that reason they were unavailable, I find that the Plaintiffs failed to show by a preponderance of the evidence that Dakota's medical records were readily accessible by her. Even if Nurse Practitioner Murphy had seen the 10-fold overdose of Sudafed for which Dakota was treated, when that overdose is considered with Dakota's presentation at the well-baby visit, I conclude that the

information would not have raised a reasonable physician's or nurse practitioner's level of concern to a reasonable suspicion that Dakota was being abused.

56. I also find that Dr. Garri's treatment of Dakota's subluxated elbow on October 12, 2001, which included the precaution of reviewing x-rays, was appropriate with one exception. I conclude that Dr. Garri's failure to review this seven-week-old baby's readily accessible medical records, given the circumstance of an admittedly-inflicted trauma, deviated from the standard of care.

57. I conclude that Dakota's medical record was readily accessible to Dr. Garri in the emergency department. Dakota's medical records were located approximately 100 yards from the emergency department in Bergquist's centralized medical records department, and it was estimated that they could be retrieved in approximately five minutes. Dr. Garri did not dispute that had he asked for Dakota's records, they would have been retrieved for him.

58. The ease of accessibility to medical records by emergency room physicians at Bergquist distinguishes Dr. Garri's duty to review medical records from any duty that may or may not exist for general emergency room physicians nationwide, as described by Dr. Ohlsen, who practiced in the emergency room of a larger hospital serving the general public.

59. The expert medical witnesses and the treating physicians agreed it is never appropriate care to jerk the arm of a two-month-old child, or to attempt to lift such a child by the arm. They also agreed that while subluxated elbows are seen in infants, they are more commonly seen in toddlers after a hand-holding parent pulls the toddler's arm in an attempt to break the toddler's trip or fall.

60. Dr. Uzendoski opined that Dr. Garri did not breach the standard of care in failing to review Dakota's medical record because Dr. Garri physically examined Dakota and found no other trauma, and because John Fuller told Dr. Garri that the injury was "accidental." Although a nursing note in Dakota's medical record said the injury was caused by "lifting baby by arm," the medical record did not memorialize, nor did Dr. Garri recall, John Fuller's explanation of the mechanism of the injury. Unlike the investigation conducted by Nurse Practitioner Murphy with regard to when, where, and how a bruise appeared on Dakota's forehead, there is no evidence that Dr. Garri questioned John Fuller about when, where, or how he jerked Dakota's arm or the circumstances of the "lifting." Because Dakota was presented with an inflicted injury, I conclude that Dr. Garri had a duty to inquire about the cause of the injury, and to review readily accessible medical records to evaluate the plausibility of Fuller's explanation and to determine whether suspected child abuse was a proper diagnosis. While the evidence is not clear regarding what, if any, inquiry Dr. Garri may have made to determine the cause of Dakota's injury, it is clear that Dr. Garri did not request or review Dakota's medical records. I conclude that Dr. Garri breached the standard of care by failing to review Dakota's readily accessible medical records.

61. Having concluded that Dr. Garri deviated from the standard of care in failing to review Dakota's readily accessible medical records on October 12, 2001, I next must consider whether his failure to review Dakota's records was the proximate cause of Dakota's injuries.

62. For the reasons that follow, I conclude that Dr. Garri's breach of the standard of care did not proximately cause Dakota's injuries.

63. Dr. Garri was asked at trial to assume that he had reviewed the medical records relating to Dakota's treatment for the Sudafed overdose and relating to the bruise noted at the well-baby check. Even with those assumptions, Dr. Garri did not believe that his concern for Dakota would have risen to the level of reasonable suspicion of child abuse. Rather, Dr. Garri stated he may have called the pediatrician on-call at Bergquist or Dakota's primary care physician to suggest parenting education for the Fullers, and that such classes would have been made available through Family Advocacy.

64. Dr. Garri's testimony is consistent with the testimony of Dr. Ohlsen, who stated that parental education and guidance were all that a reasonable emergency room physician with knowledge of the Sudafed overdose, the superficial bruise, and the subluxated elbow might have recommended under similar circumstances.

65. When Dr. Tilelli and Dr. Uzendoski were asked to assume that Dr. Garri had reviewed Dakota's medical record, they agreed that the cumulative effect of the information, more likely than not, would have raised a suspicion of child abuse in the mind of a reasonable physician.

66. Even if I were to agree with Dr. Tilelli and Dr. Uzendoski that based on Dakota's medical record on October 12, 2001, a reasonable physician in like circumstances would have suspected child abuse, I cannot conclude that such a suspicion would have required a treating physician, exercising a reasonable standard of care, to do any more than report the suspicion to social service authorities.

67. Although Dr. Tilelli opined that any suspicion of child abuse requires the medical provider to admit the child into the hospital to separate the child from the risk of harm pending investigation, I do not conclude that admission to a hospital is the standard of care when an imminent threat of harm is not apparent. Rather, I conclude that the standard of care requires a reasonable physician who suspects child abuse to contact a social services agency, law enforcement, or, in the case of Air Force personnel, Family Advocacy, so that an investigation is initiated and a follow-up or placement recommendation can be made.

68. As explained by Dr. VanderSchaaf, Offutt Air Force Base's Family Advocacy personnel respond to calls from Bergquist physicians regarding suspected abuse in one of two ways: either by coming to the department immediately or by arranging for an open-ended consultation to occur within approximately one week of the physician's call.

69. Thus, even if I were to conclude that a review of Dakota's medical records would have raised a reasonable physician's concern to the level of a suspicion of child abuse, I conclude that proximate cause has not been established. There is no proof, only wishful speculation, about what, if anything, might have been prevented had Dr. Garri placed a call to Family Advocacy. No Family Advocacy employee testified. I have no information regarding how professionals in that office would have viewed the evidence in Dakota's case.

70. Dr. Tilelli testified that effective intervention can modify or alter the stressors upon an abuser and lower the risk of critical and lethal non-accidental injuries to at-risk

children, but even this testimony asks the Court to assume that any intervention would have been timely and effective.

71. I conclude that proximate cause has not been proven by a preponderance of the evidence. I surmise that Dakota's medical record as of October 12, 2001, had it been reviewed, would have given a reasonable physician cause to suggest parental education and counseling for John and Christina Fuller. What good, if any, that might have done is left to conjecture. There is no evidence that if Dr. Garri had reported Dakota's history to Family Advocacy on October 12, 2001, then Dakota would not have been violently shaken by John Fuller on December 2, 2001.

### *CONCLUSION*

Dakota is fortunate to be in the care of Valerie and Fernando Chapa. While Dakota and the Chapas live with the tragic consequences of the trauma inflicted upon Dakota when he was an infant, I conclude that they have failed to demonstrate by a preponderance of the evidence that the United States of America through its employees was legally responsible for Dakota's injuries or for the damages claimed by the Plaintiffs. Judgment will be entered in favor of the Defendant.

IT IS SO ORDERED.

A separate judgment in favor of the United States of America shall be entered in this case.

DATED this 26th day of June, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge